# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| DARSHAE SMITH, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 2:17-cv-00983-JHE |
| CITY OF BIRMINGHAM, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION[1]

Through her amended complaint, Plaintiff Darshae Smith ("Smith" or "Plaintiff") brings this employment discrimination action against Defendant the City of Birmingham (the "City" or "Defendant"). (Doc. 23). The City has moved for summary judgment on all of Smith's claims. (Docs. 32). Smith opposes this motion, (docs. 37), and the City has filed a reply brief in support, (doc. 42). The motion is fully briefed and ripe for review. (Docs. 33, 37 & 42). For the reasons stated more fully below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 9).

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

    The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

The City is a municipal corporation under Alabama law. (Doc. 20-1 at ¶ 5). Smith, who is female, began working for the City on July 27, 2015, as a temporary laborer with the City's Department of Public Works. (*Id.* at ¶¶ 4-5; Deposition of Darshae Smith, doc. 33-1 ("Smith Depo.") at 6 (21:17-22); Deposition of Andrea Travis Stallworth, Doc. 33-4 ("Stallworth Depo.") at 31 (123:1-4)). Smith was not a permanent employee. (Smith Depo. at 6 (21:4-14); Stallworth Depo. at 31 (123:23-124:1)). As a temporary laborer, Smith's duties primarily involved cutting grass, picking up paper, and generally keeping the City of Birmingham clean. (Smith Depo. at 6-7 (20:22-22:9); Stallworth Depo. at 31 (124:3-6)).

When Smith started working for the City, her immediate supervisor was Gerald Young ("Young"). (Smith Depo. at 6 (22:16-19)). Young's supervisor was Gjamal Rodriguez ("Rodriguez"). Rodriguez also supervised Smith, although he was not her immediate supervisor. (Smith Depo. at 6 (22:10-19)). Rodriguez's supervisor was former Deputy Director Alfred Menifield ("Menifield"). (Stallworth Depo. at 32 (127:18-20)). And Menifield was supervised by former Public Works Director Stephen Fancher ("Fancher"). (*Id.* (127:21-23)). Rodriguez was not Smith's immediate supervisor. (Smith Depo. at 6 (22:10-23:11); Stallworth Depo. at 32 (128:18-20)).

Beginning in August 2015, Rodriguez began to sexually harass Smith. (Smith Depo. at 8 (31:22-32:20)). Rodriguez made comments such as: "you look good in those jeans"; "I sure would like to touch"; "you look good today"; "I'm the man to get you in, you know, if you just give me what I want"; "you know what I want, I told you you look good"; "you are young and tender"; "are you going to try it out?"; and "You know I can't have sex with my wife because she got cancer, and we can't have sex right now. So I'm looking for someone to have sexual relations

3

with." (Smith Depo. at 8-10 (32:12-39:12)). At one point, Rodriguez called Smith on her cellphone and asked if they could "get up" when he returned from a five-day trip to Atlanta for his wife's cancer treatment; tired of Rodriguez's comments, Smith stated "I'm going to see what I can do, but I doubt it if I can get up with you like that." (Smith Depo. at 10 (38:12-39:12)). Smith recalled five specific instances of Rodriguez's advances, but testified Rodriguez made similar comments "every day" and asked her to go out with him and to have sex on numerous occasions. (Smith Depo. at 10-11 (40:21-41:7-23)). Fearing termination, Smith did not report any of Rodriguez's conduct to anyone with the city between July 27, 2015 and January 22, 2016.[2] (Smith Depo. at 12 (47:12-48:14)).

The City terminated Smith's temporary employment on January 22, 2016, ostensibly for lack of funding; she and approximately two hundred other temporary laborers were laid off. (Smith Depo. at 31; Stallworth Depo. at 31-32 (124:7-125:4)). Andrea Travis Stallworth ("Stallworth"), the City's administrative service manager for the Public Works Department, testified that Rodriguez had no authority to promote, hire, or fire Smith and could not promise her a job. (Stallworth Depo. at 32 (128:14-18)).[3] However, Smith testified that after she was terminated,

---

[2] The City's Sexual and Gender Harassment Policy sets out a mechanism for reporting sexual harassment. (Smith Depo. at 29-33 (Def. Exh. 9)). Smith testified she had received, read, and understood the policy. (Smith Depo. at 7-8 (26:10-30:11), 15 (57:20-22)). Further, Smith twice signed forms acknowledging she had been informed of the policy. (Smith Depo. at 27-28 (Def. Exh. 7 & 8)).

[3] The City goes somewhat beyond Stallworth's testimony when it states Rodriguez "did not have any authority to affect [Smith's] pay, make [her] a permanent employee, promote, hire, terminate, or discipline Smith." (Doc. 33 at 4). The cited portion of Stallworth's testimony is:
    Q:    Did Mr. Rodriguez at any point in time have any authority to promote or
           hire or fire her?
    A:    No.
    Q:    Okay. He couldn't promise her a job or anything like that?

4

Rodriguez called her and told her: "If you would have did what I told you to do, then you would have had your permanent position before the 22nd, the layoff date, but I'm going to still put you on the list to come back to the City of Birmingham." (Smith Depo. at 11 (42:19-43:12)). Smith testified that she was told supervisors could make recommendations as to hiring or firing. (*Id.* (43:22-44:8)).

On June 22, 2016—about five months after Smith's termination—Smith scheduled a meeting with Peggy Pope ("Pope"), the City's head of Human Resources ("HR"). (Smith Depo. at 12 (45:20-46:16)). Since Pope was not there, Smith met with two other HR representatives: Jennifer Samuelson ("Samuelson") and Tina Bray. (*Id.*; Samuelson Depo. at 3 (11:19-23)). At the meeting, Smith stated she had voice recordings showing Rodriguez had made sexual advances towards her. (Smith Depo. at 13 (49:3-51:7); Samuelson Depo. at 3-4 (12:6-13:10), 24-25). Smith did not show up to a follow-up meeting on June 27, 2016, nor did she call to reschedule or return Samuelson's phone calls. (Samuelson Depo. at 4 (13:11-16), 7 (25:15-24)). Smith filed an EEOC charge related to Rodriguez's harassment on July 8, 2016. (Doc. 41-5).

On August 8, 2016, the City re-hired Smith as a temporary laborer to begin a new temporary assignment. (Smith Depo. at 13 (52:9-23)). Although Rodriguez was not Smith's supervisor and Smith was not assigned to work with him, Fancher was still the ultimate decisionmaker regarding Smith's employment. (*Id.* at 14 (53:1-6); Stallworth Depo. at 8-9 (32:14-35:1)). Smith's temporary assignment began in the horticulture department under a chain of command that did not include Rodriguez, but shortly afterward she was transferred to the sewer

---

A:   No.

maintenance department.[4] (Smith Depo. at 15 (59:20-60:4); Stallworth Depo. at 32 (125:15-126:12)).

On February 28, 2017, Smith's supervisor, Senior Construction Supervisor Mike Brown ("Brown") wrote Smith up for "Insubordination, Failure to comply with Instructions given by a Superior Officer or Supervisor, Violation of Mayor's Executive Order 50-86 General Safety Rules 3.0 PPE (foot wear), Violations of Departmental Directive 5-6 PPE, City of Birmingham Supplemental Personnel Policies and Procedures 2.2 Core Values and Expected Employee Behavior, Failure to meet the minimum standards of a Temporary Employee." (Doc. 37-1 at 5). To substantiate this, the write-up indicated:

> On or about February 13, 2017, Senior Construction Supervisor, Mike Brown, had his first meeting with the Storm Sewer Crew as their new supervisor. At this meeting he noticed that you, Ms. Darshae Smith, was [sic] not wearing safety shoes. It was mentioned that all employees need to comply with the uniform policy. Mr. Brown was informed that you had not worn safety shoes since your temporary employment started. On 2/13/2017 the District Supervisor, Charles Stewart, told you to get safety shoes. On the morning of 2/21/2017, Mike Brown met with the Storm Crew and you did not have safety shoes. Mr. Brown instructed you again, to get sturdy work shoes, that night. You took off work the next day. On 2/24/2017 Mike Brown saw you at North Lot without safety shoes. He took a picture of you. When you came to work Monday, 2/27/2017, you were wearing safety shoes.

(*Id.*). Prior to the write-up, Smith had explained that she had not acquired safety shoes because a house fire had destroyed her work boots.[5] (Smith Depo. at 15 (60:12-23)). As noted in the report,

---

[4] Smith testified she was "not upset" at this transfer. (Smith Depo. at 15 (60:9-11)).
[5] The City purportedly disputes this fact because Smith did not testify to a specific date and time she informed the City about the house fire. (Doc. 42 at 5). This is true, but a reasonable inference for summary judgment purposes from Smith's testimony that she "had boots until the house fire occurred," (Smith Depo. at 15 (60:22-23)), and had "explained that to them*,"* (*id.* (60:15-17)), is that this occurred prior to her write-up.

Smith had reported to work the day prior to the write-up with the correct shoes.[6] Smith denied that she had been told previously to wear proper safety shoes. (*Id.*).

Smith's disciplinary history prior to the write-up consisted of two warnings for tardiness. (Doc. 37-1 at 2-4). Stallworth testified two tardiness violations would not have placed Smith's job in jeopardy. (Stallworth Depo. at 10 (39:13-17)). On March 1, 2017, the City obtained statements from six coworkers regarding Smith's shoe-related violation, only one of which indicated that Smith had worn "tennis shoes" to work. (Doc. 41-3). Other workers indicated they had not paid attention to Smith's shoes, and one coworker stated she was told she "HAD TO" write a statement. (*Id.*).

On March 7, 2017, Smith received a "Notice of Determination Hearing" from Fancher, setting Smith's hearing for the following day. (Doc. 37-1 at 7). Menifield handled the disciplinary investigation and conducted the determination hearing. (Doc. 37-1 at 7). Fancher, who was on vacation and not present at the disciplinary hearing, ultimately signed off on the decision to terminate Smith on March 8, 2017.[7] (Doc. 37-1 at 8; Smith Depo. at 1 (58:11-15); Stallworth Depo. at 14 (55:12-17)).

The City follows the Rules and Regulations of the Personnel Board of Jefferson County and the City of Birmingham Supplemental Human Resources Policies and Procedures when disciplining its employees. (Stallworth Depo. at 5 (20:2-6), 11 (42:18-43:22)). These policies apply to all employees, regardless of classification status. (*Id.*). Past rules infractions are taken

---

[6] The City states it disputes this because it is "Not reflected in the Exh., Pg. 5," (doc. 42 at 5), but the write-up clearly indicates this.

[7] The parties dispute to some extent the person who made the decision to terminate Smith. (Doc. 33 at 6; doc. 37 at 11; doc. 42 at 6). The undisputed evidence, including Smith's testimony, is that Fancher was not present at the hearing but signed off on the determination.

into account in administering discipline only if (1) they occurred in the previous twelve months and (2) were the same type of offense. (*Id.* at 28 (109:19-111:16)).

Rodriguez has a lengthy disciplinary history stretching back to 2003, including write-ups for being late to work, being out of uniform (on two occasions), damaging city equipment, failing to report a fight between coworkers, gambling and paying off gambling debts during working hours, taking unauthorized breaks, failing to secure city equipment (ultimately resulting in the theft of the equipment), and insubordination. (Stallworth Depo. at 19-26 (76:6-88:20, 91:7-101:14); doc. 38-2). Despite this, Rodriguez has received several promotions, and has received a maximum punishment of a three-day suspension from Fancher for failing to report the fight.[8] (Stallworth Depo. at 20 (79:16-80:12), 23 (89:3-90-9)).

### III. Analysis

Smith's amended complaint raises two Title VII claims: a sexual harassment claim, (Doc. 23 at ¶¶ 17-21), and a retaliation claim, (*id.* at ¶¶ 22-30). The City contends it is entitled to summary judgment on both, as well as on Smith's claims for punitive damages. Each of these is discussed separately below.

#### A. Sexual Harassment

Title VII prohibits an employer from "fail[ing] or refusin[ing] to hire or . . . discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his

---

[8] Smith describes at length a specific incident that occurred on October 17, 2016, for which Rodriguez received a letter of reprimand and training following a hearing. (Doc. 37 at 13-15). Specifically, while Rodriguez was supposed to be supervising several crews, "one crew was riding around in circles, another was parked on a dead-end street with a crew member in the rear seat of the cab, and yet another crew was performing in a manner that was wasteful of time, energy, and materials." (Doc. 41-1). The City characterizes Smith's description of this event as "[a]dmitted but immaterial." (Doc. 42 at 6-7).

8

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

When a plaintiff bases his disparate treatment claims on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). Under the *McDonnell Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant does so, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

A plaintiff seeking to make out a *prima facie* case of sexual harassment must show "(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for

9

holding the employer liable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). To show the fourth element, a plaintiff may rely on one of two theories: either the employer (1) took a "tangible employment action" against her or (2) subjected her to "severe or pervasive conduct." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Under the first theory, an employer is strictly liable for the harassment suffered by the employee; conversely, an employer may assert an affirmative defense if the plaintiff relies on the second theory.

The City does not dispute that Smith belongs to a protected group, that she was subjected to unwanted sexual harassment, or that the harassment was based on her sex. (Doc. 33 at 12-16). Instead, the parties' argument is about the third factor, and specifically over which theory Smith may advance. The City argues it took no tangible employment towards her, so Smith must be proceeding under the "severe or pervasive" theory. (Doc. 33 at 13). As such, it focuses its briefing solely on its defense: that Smith failed to report the sexual harassment and failed to cooperate in the investigation into her allegations.[9] (*Id.* at 13-16). Smith ignores the City's defense, contending her claim "fits squarely within the 'tangible employment action' theory" because she was fired. (Doc. 37 at 19, 22). Under this interpretation of events, even though it is undisputed that Rodriguez could neither hire nor fire Smith, Fancher simply served as Rodriguez's "cat's paw." (*Id.* at 23). So Smith does not take on the "severe and pervasive" arguments from the City's brief.

---

[9] This is the *Faragher-Ellerth* defense, under which the City may avoid liability under a "severe or pervasive" theory if it establishes that "(1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities it provided." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007) (citations, alterations, and internal quotation marks omitted).

10

In response, the City reiterates all of its "severe and pervasive" arguments, dismissing in two sentences Smith's claim she was fired because (1) Rodriguez had no authority to affect Smith's job during her employment with the City and (2) Smith's job ended along with that of many other temporary employees. (Doc. 42 at 8-9).

Because the parties take such wildly different positions, neither really confronts the other's arguments. To settle this squabble, the undersigned must determine whether Smith is correct that she suffered a tangible employment action. If she did, the City has not met its own burden to show it is entitled to summary judgment. *See Celotex*, 477 U.S. at 322. If she did not, Smith has abandoned any means to dispute the City's defense, and thus her claim. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In most cases, a tangible employment action "inflicts direct economic harm" on the employee. *Id.* at 762. The employee must also show "a causal link between the tangible employment action and the sexual harassment." *Cotton*, 434 F.3d at 1231.

Here, Smith undisputedly was laid off by the City on January 22, 2016, at Fancher's direction. This certainly would qualify as a tangible employment action if Smith could show a causal link between the termination and the harassment. Smith's attempt to show this causal link boils down to her testimony that Rodriguez told her after the layoff that "[i]f you would have did what I told you to do, then you would have had your permanent position before . . . the layoff date" and that she had been told supervisors could make recommendations for retention. (Doc. 37 at 24). The ultimate source for this is Smith's deposition testimony, both as stated above regarding Rodriguez's representations to her and in the following excerpt:

> Q: So do you know if [Rodriguez] actually had any authority to put you on a list or make you a permanent employee, or you were just listening to what he was telling you?
>
> A: I was listening to what he was telling me.
>
> Q: You don't have any definitive knowledge as to if he can hire or fire, do you?
>
> A: I have knowledge of they saying supervisors recommend.

(Smith Depo. at 11 (43:22-44:8)). Thus, Smith argues she was only terminated by Fancher because Rodriguez failed to recommend her for retention. (*See* doc. 37 at 24). This is the so-called "cat's paw" theory of liability, which applies "when a biased actor recommends that an adverse employment action be taken against an employee, [even though] the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt, Inc.,* 372 F. App'x 936, 938 (11th Cir.2010) (citing *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999)).

The City's only discernable effort to undermine Smith's testimony is its statement in response to Smith's additional purportedly undisputed fact setting out her testimony as to Rodriguez's statement regarding her permanent position: "Admitted that Plaintiff testified to the statement; but it is hearsay as Rodriguez was never deposed by Plaintiff." (Doc. 42 at 3). To the

extent this could be construed as an evidentiary objection, it is insufficient to prevent the court from considering the statement as summary judgment evidence. Although "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," a court may nevertheless consider the statement provided that it "could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999)). Consistent with this, the Federal Rules of Civil Procedure require that an evidentiary objection to summary judgment evidence indicate that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The City's description of the statement as hearsay is not an argument that the statement could not be reduced to admissible evidence. Since "[t]he most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial," *Jones*, 683 F.3d at 1294, Smith could call Rodriguez as a witness and solicit his testimony.[10] Nor does the City indicate why Smith's failure to depose Rodriguez affects the calculus at summary judgment. Accordingly, notwithstanding Smith's statement is hearsay, the undersigned considers it.

Of course, whatever Rodriguez told Smith does not matter if he had no power to affect Smith's employment. That brings the analysis to the next portion of Smith's argument: that Fancher served as Rodriguez's cat's paw when he fired Smith. The City's position is that Rodriguez had "no authority to affect [Smith's] job." (Doc. 33 at 13; doc. 42 at 8). By focusing

---

[10] This assumes the truth of Smith's recounting of Rodriguez's phone call telling her she would have received a permanent position had she done "what [Rodriguez] told [her] to do," but the court must make that assumption for summary judgment purposes. The undersigned likewise assumes that Rodriguez would testify honestly at trial.

exclusively on whether Rodriguez had the power to "to affect [Smith's] pay, make [her] a permanent employee, promote, hire, terminate or discipline" her, (doc. 33 at 4),[11] the City ignores Smith's cat's paw argument and misses the point. If Rodriguez could recommend that Smith be retained through the layoff and withheld his recommendation because Smith declined his advances, Smith suffered the natural consequences of that: layoff along with the other two hundred temporary workers, each of whom presumably also lacked the recommendation of a supervisor. Considering Smith's testimony alongside the evidence the City cites as to Rodriguez's authority, there is a factual dispute as to whether he could, and thus as to whether the City took a tangible employment action against Smith causally linked to Rodriguez's sexual harassment. Accordingly, a jury must settle the issue.

Since Smith has adduced sufficient evidence to proceed on the tangible employment action theory, the City may not assert the defense it contends entitles it to summary judgment. And since the City relies exclusively on this inapplicable defense, the City's motion is due to be denied as to Smith's sexual harassment claim.

**B. Retaliation**

Title VII bars an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." To establish a *McDonnell Douglas prima facie* case of Title VII or § 1981 retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was

---

[11] As stated above, the City's framing of Stallworth's testimony is more expansive than what she actually testified to. *See supra*, n.3.

some causal relation between the two events." *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001)). A retaliation plaintiff must show that the "protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).

Unlike Smith's sexual harassment claim, the parties' briefing on Smith's retaliation claim aligns. Smith's complaint alleges she was fired because she reported Rodriguez's harassment and filed an EEOC charge. (Doc. 23 at ¶ 23-24). The City concedes the first two elements of Smith's *prima facie* case and focuses solely on the third. (Doc. 33 at 17). It offers two primary justifications for why there is no causal connection between Smith's termination and her protected activity. First, it argues Fancher, who signed off on the determination to terminate Smith, did not know about her protected activity. (Doc. 33 at 18). Second, it contends the temporal gap between Smith's termination and either her HR report or her EEOC charge is too great to support causation. (*Id.* at 18-19). And, assuming Smith could make out a *prima facie* case, it highlights her failure to wear safety shoes as a legitimate, nondiscriminatory reason for termination. (*Id.* at 19).

"At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (citation omitted). The City states in conclusory terms that "there is no evidence that Fancher was aware" of Smith's HR report. (Doc. 33 at 18). Smith points to Stallworth's deposition testimony that Fancher was aware of the EEOC charge when it was filed. (Doc. 37 at 25) (citing Stallworth Depo. at 7 (26:13-27:8)). The City attempts to rebut this by stating that Stallworth "cannot speak for Fancher's direct knowledge

15

of anything yet [sic] alone his personal knowledge of the filing of an EEOC charge." (Doc. 42 at 14). There are two glaring problems with the City's position. First, Stallworth was testifying as the City's Rule 30(b)(6) representative, (Stallworth Depo. at 2 (8:6-8); doc. 33-5 at 1), so she clearly can speak to what was done with the EEOC report internally when it was filed. *See United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (a 30(b)(6) representative's testimony "represents the knowledge of the corporation, not of the individual deponents"). Second, Stallworth was specifically testifying about the accuracy of the City's discovery responses, which list Fancher as a person who "participated in, conducted, or otherwise oversaw and/or monitored" the investigation into Smith's EEOC charge, (*see* doc. 33-6 at 3-4). The City cannot reasonably contend Fancher did not know about Smith's EEOC charge when its own discovery responses and corporate representative state the contrary.

The City's second argument is more apt. "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted). In *Thomas*, the court found three months to be too long to show a causal connection, without more. *Id*. Smith does not argue the temporal connection here, considerably longer than three months, is sufficient. Instead, she says the shoe infraction was the City's first opportunity to retaliate against her. (Doc. 37 at 25). But the City could easily have retaliated against her earlier by simply not hiring her again. Smith's contention that the City's first opportunity to take an adverse action against her did not come until March 8, 2017—nearly ten months after she reported Rodriguez's conduct to the Human Resources Department (June 22, 2016), eight months after she filed her EEOC charge (July 8, 2016), and seven months after her rehire date (August 8, 2016)—strains credulity.

16

The cases Smith cites provide no support for her first-opportunity argument. In *Jones v. Suburban Propane, Inc.*, which Smith cites for the basic proposition that "if there was a significant time gap between the protected expression and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as . . . the adverse action was the 'first opportunity' for the employer to retaliate," the court found the plaintiff had not alleged any such evidence. 577 F. App'x 951, 955 (11th Cir. 2014). In *Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005), the court found a two-year delay was not fatal to the plaintiff's case when the manager who took the retaliatory acts was not in a position to retaliate until he received responsibility for making personnel decisions. Here, though, Smith had the same ultimate decisionmaker she alleges was responsible for her retaliatory firing: Fancher. And in *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002), the court found a five-month gap between the protected action and the retaliatory conduct could nevertheless support an inference of causation because the plaintiff's supervisor changed. Although Smith's immediate supervisor changed, she does not argue Brown had any retaliatory animus towards her (or was even aware of her EEOC charge).

Smith's last effort to get around this is her effort to show she was treated differently than Rodriguez, who has an extensive history of misconduct, arguing a "causal connection can be shown if a plaintiff-employee presents evidence that, after the employer learned of the EEOC charge, the employer treated the employee differently from similarly-situated nonprotesting employees." (Doc. 37 at 27-28) (citing *Williams v. Hager Hinge Co.*, 916 F. Supp. 1163, 1177 (M.D. Ala. 1995)). Although the City does not attempt to address Rodriguez as a comparator, (*see* doc. 42 at 13-15), Smith bears the burden of persuasion as to her *prima facie* case. Thus, the undersigned considers whether she has met that burden with her comparator argument.

While the parties' briefs were under submission, the Eleventh Circuit clarified that, at the *prima facie* stage, a plaintiff must show she and any "proffered comparators were 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1218. The court supplied several criteria that generally apply to a similarly situated comparator: he or she will ordinarily (1) "have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "have been under the jurisdiction of the same supervisor as the plaintiff"; (4) and "share the plaintiff's employment or disciplinary history." *Id.* at 1227-28. Notwithstanding *Lewis* announced an arguably new standard,[12] Smith did not attempt to show Rodriguez was similarly situated under any of the previous Eleventh Circuit standards; instead, she simply assumes he was. Although Rodriguez does appear to have a checkered disciplinary history, he is not an appropriate comparator for two interrelated reasons. First, Smith and Rodriguez have very different employment roles; Smith was a temporary line employee, while Rodriguez was a permanent manager. Second, none of Rodriguez's misconduct is "the same basic" type as Smith's; instead, the majority of it is Rodriguez's failures in his supervisory duties, which Smith did not share.[13] Smith even emphasizes this point, noting that Rodriguez is "unqualified and incompetent as a manager," (doc. 37 at 27). Since Smith was not a manager, Rodriguez's incompetence as a manager does not say anything about how the City

---

[12] The *Lewis* court noted that that it was not "really breaking new ground" with the "all material respects" formulation. 918 F.3d at 1227 n.12

[13] In fact, Rodriguez's management failures regarding the October 2016 incident Smith recounts in her response were detailed in a letter from Menifield to Rodriguez. (Doc. 41-1 at 1-5). Menifield states the City expects "a Horticultural Operations Manager to be a role model in judgment, initiative, leadership and supervisory skills . . . assist and inspire their crews to perform quality and productive work at all times, and help them to understand that subpar performance or inappropriate behavior will merit fair, but consistent disciplinary actions." (*Id.* at 2).

treated her.  To the extent Smith implies Rodriguez's were worse infractions than hers, that is not for the court to decide in assessing whether he is an appropriate comparator.  Although there are a few respects in which Rodriguez and Smith are similarly situated (e.g., they were both ultimately supervised by Menifield and Fancher and were both subject to the same City policies), Smith's evidence falls far short of demonstrating they were similarly situated in most material respects, let alone all.

Since Smith cannot show a *prima facie* case of retaliation, her arguments that her termination was pretextual, (doc. 37 at 28), is beside the point.  But even accepting she had presented a *prima facie* case, Smith's pretext argument is simply a one-paragraph rehash of her argument that Rodriguez is an appropriate comparator.  (*Id.*).  Accordingly, the City is due summary judgment on Smith's retaliation claim.

### C. Punitive Damages

Finally, the City argues it is immune from punitive damages as a matter of law.  (Doc. 33 at 19-20).  In support, it cites Ala. Code § 6-11-26, which states "[p]unitive damages may not be awarded against the State of Alabama or any county or municipality thereof; or any agency thereof*."* *(Id.* at 20).  Additionally, it notes that the Supreme Court has held "considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Smith does not respond to this argument.  Consequently, she has abandoned any claim for punitive damages, and the City is entitled to summary judgment as to Smith's surviving sexual harassment claim to the extent it seeks punitive damages.  *See Resolution Trust Corp.*, 43 F.3d at 599.

## IV. Conclusion

For the reasons stated above, the City's motion for summary judgment, (doc. 32), is **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is **GRANTED** as to Smith's retaliation claim. It is also **GRANTED** as to Smith's claims for punitive damages. The motion is **DENIED** in all other respects. Smith's sexual harassment claim, Count I of her complaint, will go forward. The parties are encouraged to discuss alternative dispute resolution, including the potential for mediation. The parties are **ORDERED** to file a joint status report by **October 7, 2019**, regarding the status of such discussion and whether they believe mediation would be beneficial to the resolution of the remaining claim.

DONE this 23rd day of September, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE